GIBSON v. DEZIEL

1. Money Received—Checks—Lot Reservations—Evidence—Sufficiency.

A finding that plaintiff, a mobile home dealer, gave ten checks to defendants, mobile home park owners, to secure lot reservations for plaintiff's customers was not clearly erroneous where the reverse of each check contained the written designation "lot reservation"; therefore that portion of the lower court judgment denying plaintiff the return of the checks, not being clearly erroneous, required affirmance, where the plaintiff failed to prove that he gave the checks to defendants to enable them to obtain a mortgage loan by showing the mortgagee that a number of mobile home lots were in demand and had been reserved and that defendants had agreed to return the checks after the loan had been approved (GCR 1963, 517.1).

2. Money Received — Performance Bonds — Checks — Cashing — Evidence.

Plaintiff's theory that checks bearing on the reverse side the notation "performance bond" or "performance bond to be returned when trailer is set up" were issued by him to defendants to secure proper installation in defendant's trailer park of mobile homes sold by plaintiff was not negated by the fact that plaintiff continued to issue such checks after he became aware that defendants had cashed some of them, because possession of the checks alone would not provide adequate security for defendants.

Appeal from Macomb, George R. Deneweth, J. Submitted Division 2 April 8, 1970, at Lansing. (Docket No. 6,395.) Decided June 22, 1970.

References for Points in Headnotes

[1] 46 Am Jur, Replevin §§ 19, 112.
[2] 41 Am Jur, Pledge and Collateral Security §§ 73–75.

Complaint by Leo Gibson against Pierre Deziel, John Dinan and Louis Deziel for conversion of deposit checks and performance bond checks. Judgment for defendants. Plaintiff appeals. Affirmed in part, reversed in part.

*Perica, Breithart, McAlpine & Carmody,* for plaintiff.

*Johnston & Wendt,* for defendants.

Before: McGREGOR, P. J., and DANHOF and LARNARD,* JJ.

LARNARD, J. Leo Gibson does business as Leo Gibson Mobile Home Sales with his principal place of business in Warren, Michigan. The defendants are a co-partnership operating a mobile home park in Warren. On or about July 1, 1964, defendants were engaged in the business of developing and constructing a mobile home park. Plaintiff alleges that in conjunction therewith, he was approached by the defendants and told that in order for the defendants to obtain an FHA-insured mortgage loan, the defendants would need to show that a number of mobile home lots were in demand and had been reserved. The defendants requested plaintiff to deposit checks with them to indicate the reservation of lots and that upon approval of the loan defendants would return these checks to plaintiff. In accordance with these requests plaintiff deposited with the defendants ten checks, each in the amount of $86. The back of these checks contained the designation "lot reservation". On September 23, 1964, defendants, contrary to the agreement with plaintiff,

---

* Circuit judge, sitting on the Court of Appeals by assignment.

cashed these checks and used the funds for their own benefit.

Plaintiff also alleges that in the conduct of his business, he sold mobile homes to customers who desired to move these homes onto defendants' mobile home park. The defendants refused to allow plaintiff to move the homes into the park unless the plaintiff would post a $100 performance bond for each trailer to be moved in. The performance bond was to insure the proper installation by plaintiff of the trailers. The plaintiff moved in 27 mobile homes, and paid defendants the sum of $2,700. This amount was paid to defendants by means of 27 individual checks drawn by plaintiff for the sum of $100 each. Each of the 27 checks contained either the notation "Performance Bond" or "Performance Bond to Be Returned When Trailer is Set Up." According to plaintiff, these moneys were to be a performance bond and were to be returned upon proper installation of the homes. The defendants, however, cashed the 27 checks, converted the $2,700 of plaintiff's money and refused to return such money.

It is defendants' contention that the ten checks for $86 each, represented, as indicated on the checks, deposits to guarantee lot reservations for plaintiff's customers. It is also the defendants' contention that the $100 charge was not a performance bond, but rather an admission fee.

The trial judge, sitting without a jury, found in favor of defendants on the basis that plaintiff had failed to meet its burden of proof. From this determination, plaintiff claimed his appeal.

This appeal presents essentially a question of whether the evidence supports the verdict. It is made somewhat difficult because of the failure of the trial judge to provide a sufficient finding of facts. The record discloses that there was sufficient evi-

dence to support the trial court's determination that the payment of the $86 checks was for the purpose of securing lot reservations, and we find that the judgment of the trial court on this issue was not clearly erroneous. As this Court said in *Cook* v. *Weinberger Builders, Inc.* (1969), 19 Mich App 475, 476:

"The findings of fact by the trial court   *   *   * are not clearly erroneous, GCR 1963, 517.1, and, in fact, are supported by the record. This requires affirmance of that part of the judgment."

The more difficult question is the portion of the trial court opinion dismissing plaintiff's cause of action for return of the $2,700 represented by the 27 $100 checks.

The record indicates that the trial court's opinion was somewhat influenced by the fact that the plaintiff continued to give money to the defendants even after some of the $100 checks had been cashed by defendants and returned to the plaintiff by the drawee bank, and in general continued to do business with the defendants.

It must be remembered that plaintiff's theory as to why these 27 checks were given was that they were to serve as a performance bond to secure proper installation of the individual trailers. Merely having possession of the checks did not provide adequate security to defendants, for prior to negotiation by defendants, the plaintiff could have issued stop orders on any or all of the checks issued, thus rendering the checks worthless as security for proper performance in setting up the trailers. It was therefore not contrary to, or inconsistent with, the restricted nature of the "performance bond fund" provided by the checks, for defendants to cash the 27 checks. However, this fact does not alter the

written expressed purpose appearing on the reverse of the checks. The proceeds of the cashed checks continue to be impressed with their original character, *i.e.* "performance bond fund". It was therefore not unreasonable for plaintiff to continue to issue checks on the assurance by defendants that the $100, not necessarily in the form of the original check, would be returned to him.

It was also not inconsistent for the plaintiff to continue to do business with defendants generally even though there were vacancies in other trailer parks and the defendants owed him money. It must be observed from the testimony at trial that the customers of the plaintiff, and not the plaintiff, were the persons who made the decision as to where they desired the trailer to be located.

The record shows the existence of persuasive evidence which supports plaintiff's theory that the checks were to be "performance bonds" rather than entrance fees as alleged by defendants, and were to be returned upon proper set up of the individual trailers.

Testimony of the plaintiff, Leo Gibson, disclosed the following:

"*Q.* You were in Louisville?

"*A.* I called him and said, 'look, what is going on,' because he wasn't moving the trailers unless I gave him a check for $100 with each trailer. I said, 'What is it for?' He said, 'It is a performance bond.'

"*Q.* He told you this over the telephone?

"*A.* He said, 'You get those trailers in and set them up. Probably not everything is checked out. You will get your $100 back.' I said, 'Okay, Lou.'"

and further in the record:

"*Q.* You called your secretary?

"*A.* I called her and told her, 'Miss Sherman, you write a check for $100 for each trailer we put in and

write on the back, 'Performance Bond. Money to be returned when work completed satisfactorily' ".

The record further shows the testimony of Helen E. Sherman, the secretary and office manager regarding the issuance of the twenty-seven $100 checks as follows:

"*Q.* I want to show you plaintiff's exhibit 2 which is a packet of 27 checks each in the amount of $100 made out to Lafayette Place, and ask you if you can identify those?

"*A.* Yes.

"*Q.* I think there is one or two checks in there that was signed by Leo Gibson himself, but the balance can you identify your signature?

"*A.* Yes.

"*Q.* Signed for Leo Gibson?

"*A.* Right.

"*Q.* You made out those checks? You recall making out those checks?

"*A.* Yes.

"*Q.* And the endorsement contained on the back of those checks, did you place that endorsement there?

"*A.* Yes, I did.

"*Q.* Some of the endorsements read, 'Performance Bond', and some of them, 'Performance Bond to be returned when trailer is set up?'

"*A.* Yes.

"*Q.* That is your handwriting?

"*A.* Yes.

"*Q.* That was placed on them at the time you wrote the check?

"*A.* Yes.

"*Q.* Or some subsequent time?

"*A.* No.

"*Q.* You gave these checks out. What did you do with the checks?

"*A.* These checks I gave to the driver when he takes the coach to the park.

"*Q*. This is a man that takes it over and sets it up?

"*A*. Yes.

"*Q*. Is he employed by you or Mr. Gibson?

"*A*. Yes.

"*Q*. So you gave him a check and he would take the coach over and he would give a check to Lafayette Place?

"*A*. Yes, because they won't let the coach in until they have the checks, all parks.

"*Q*. And the endorsements that were placed upon both of these checks, that is 'Lot Reservation' and 'Performance Bond,' was that placed there at the request of Mr. Gibson?

"*A*. Yes.

"*Q*. Did he give you the wording to put on?

"*A*. Yes."

Additional testimony by Mr. Paul J. Mapes, who was an employee of the defendants during the period when the $100 checks were received by the defendants, appears in the record as follows:

"*Q*. Going to the second count of the plaintiff's complaint wherein he alleged the $2,700 performance bonds that were given to Mr. Deziel, did you ever have occasion to discuss this, that these checks that Mr. Gibson had given to Mr. Deziel, or did you overhear a conversation?

"*A*. No. To start with—

"*Mr. Wendt (interposing)*: If his answer is no, that takes care of it.

"*A*. I will retract it.

"*Mr. Wendt*: Sir, you let the Judge—

"*The Court (interposing)*: Let us find out what this is all about. I am interested.

"*A*. To start with, the $100 came as a surprise to myself as well as the dealers. It did not come up until the trailers started to move in in January of 1964. And Mr. Deziel told me to charge every mobile home that came in $100. Whoever brought the

trailer in had to pay the $100 bond and it was to be a performance bond.

"*Q*. Did he tell you specifically that it was to be a performance bond?

"*A*. Yes. He told me myself because I was not to allow a trailer on this property without collecting $100.

"*Q*. You were managing the property?

"*A*. Yes. After a mobile home was put on the site and set up, to my satisfaction, the $100 was supposed to be returned.

"*Q*. This is what Mr. Deziel told you?

"*A*. That is correct. It was only to guarantee that the setup would be complete because, if it was not to our satisfaction, I was to make the repairs and that they were going to deduct it from the $100.

"*Q*. What happened next?

"*A*. Well, the next week, Mr. Deziel said that he wasn't going to be giving the money back.

"*Q*. Beg your pardon?

"*A*. Mr. Deziel said he wouldn't be returning the money.

"*Q*. He wouldn't be returning the money?

"*A*. Right, because I had occasion to ask him for a hundred dollar check to return to people when they asked me.

"Mr. Gibson was not the only dealer. There must have been at least fifteen different organizations putting mobile homes into Lafayette Place. And some of them wanted their money back.

"*Q*. And you were told by Mr. Deziel to refuse to return the money?

"*A*. That's right.

"*Q*. To your knowledge, did anybody get their $100 back?

"*A*. Only one person that I know of.

"*Q*. And who was that one person?

"*A*. Jim O'Brien from O'Brien's Mobile Home Service. He gave him $100 cash because he was not aware of the fact he had to pay it. In fact, he had to borrow part of it off the customer that he

brought the home in for. And when he finished that day, he asked me for the money and I couldn't give it to him. I had to ask Mr. Deziel and he authorized the return of it.

"*Q*. Did you ever overhear any other conversation, or were you ever a part of a conversation regarding any other conversation regarding these performance bonds?

"*A*. Well, there was—Can you give that more?

"*Q*. I do not know what your answer is going to be. Did you ever have any other conversation?

"*A*. Well, it came up, it started out that these performance bonds were to be returned when everything was set. And then later, the dealers weren't told this, but he told me that they would not be returned. We would still continue to collect it, but it would not be returned because they were going to keep the money."

The record discloses that the only evidence introduced to support the defendants' theory that the $100 checks were "entrance fees" rather than "performance bonds" was the testimony offered by Louis Deziel, the defendant. The defendants' refusal to refund was a unilateral breach of the agreement.

Our review of the factual aspects of the nature of the twenty-seven $100 checks has been to review the record herein for the purpose of determining whether the judgment rendered by the trial court was clearly against the preponderance of the evidence.

After a careful review of the record before us on this appeal, and recognizing the firmly-established rule that preponderance of the evidence may not be determined solely by the number of witnesses, but by the greater weight of all the evidence, including opportunity for knowledg eand information possessed, we reach the conclusion that the judgment entered herein on the issue of the twenty-seven $100

checks was contrary to the preponderance of the evidence.

We therefore affirm the trial court on the finding no cause of action was shown on the ten $86 checks, but we find judgment for the plaintiff in the amount of $2,700.

Affirmed in part, reversed in part. No costs to either party.

All concurred.